Argued and submitted July 30, peremptory writ to issue October 3, 2002

# STATE OF OREGON,
*Plaintiff-Adverse Party,*

*v.*

# DAYTON LEROY ROGERS,
*Defendant-Relator.*

(CC 88-00355, 88-00356, 88-00357,
88-00358, 88-00359, 88-00360; SC S49361)

55 P3d 488

Laura Graser, Portland, argued the cause and filed the brief for defendant-relator.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause for plaintiff-adverse party. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

DE MUNIZ, J.

## DE MUNIZ, J.

In this original mandamus proceeding, relator challenges a trial court order denying his motions to examine certain master jury lists and other jury records. For the reasons that follow, a peremptory writ to issue.

The underlying proceedings concern the penalty phase of a capital murder case in which relator is the defendant. The court previously has recited the relevant procedural history:

> "Over a period of time in 1987, police discovered the bodies of seven women in the Mollala Forest. The State Medical Examiner determined that each of the women had been stabbed or cut with a sharp object. When the bodies were discovered, defendant was in police custody as a suspect in the killing of another woman, Smith. Smith had died from multiple stab wounds. Smith and the seven women buried in the Mollala Forest were prostitutes. The facts surrounding the Mollala Forest killings shared other similarities with those surrounding the Smith killing. During the investigation of the Mollala Forest killings, defendant was convicted of aggravated murder for killing Smith, but he was not sentenced to death.

> "In May 1989, defendant was found guilty of 13 counts of aggravated murder arising out of six of the Molalla Forest killings. In June 1989, the court sentenced defendant to death. On automatic review, this court vacated the death sentence and remanded the case to the trial court for a new penalty-phase proceeding that would include the so-called 'fourth question,' [*i.e.*, whether the death penalty is appropriate for this defendant, considering all aspects of his life and crimes]."

*State v. Rogers*, 330 Or 282, 284, 4 P3d 1261 (2000) (citations and footnote omitted). After a new penalty-phase proceeding before a jury, the trial court again sentenced relator to death. On automatic review, this court vacated the sentence of death and remanded the case, because the trial court had erred, *inter alia*, in refusing to permit the jury to consider the option of sentencing relator to life in prison without the possibility of parole. *Id.* at 285-92.

On remand, pending the penalty-phase hearing, relator moved to obtain the Clackamas County master jury lists and other jury records for the past five years. Shortly after he filed that motion, but before the trial court had ruled, the legislature amended ORS 10.215, ORS 10.275, and ORS 136.005, to provide procedures for criminal defendants to obtain jury lists. In response, relator filed a renewed "motion to produce the jury lists"[1] and a "motion challenging jury panel & to produce source lists, etc." Relator also tendered an affidavit in support of the motions.

In the motions, relator contended that the process for selecting the jury pool[2] violates the "fair cross-section" of the community requirement of both the state[3] and federal constitutions, asserting, *inter alia*, that

"* * * cognizable groups are underrepresented therein, contrary to said constitutional provisions as well as the Equal Protection Clause of the Fourteenth Amendment and Article I, § 20 of the Oregon Constitution."

In support of those assertions, relator contended:

"Specifically, but not exclusively, [relator] believes and submits that non-caucasians, particularly Hispanics, are under-represented."

The affidavit that relator's counsel tendered in support of the motions stated:

"I believe that there have been material departures from the requirements of law regarding the summoning and selection of jurors, in the particulars and for reasons set forth in the foregoing motion, and in other respects, most of

---

[1] Specifically, relator sought the "[c]urrent Clackamas County Master Jury List, and those from 1996 to the present"; "[c]urrent Clackamas County source lists, and those from 1996 to present"; and "[l]ists of all Clackamas County jurors who received and returned summons from the 1996 term through the present term."

[2] Relator's jury pool challenge addresses "the source list, master list, the term list and the process that brings prospective jurors into the courtroom."

[3] Relator's motions cite to Article I, section 11, of the Oregon Constitution as the source of a "fair cross-section" requirement in the Oregon Constitution. Further, relator has not suggested different analyses under the federal and state constitutions. Thus, we assume the "fair cross-section" analyses under both constitutions are the same. *See State v. Compton*, 333 Or 274, 289, 39 P3d 833 (2002) (so stating).

which cannot be determined, in my opinion based on review of expert testimony, without the relief requested in the foregoing motion."

At a subsequent hearing on the motions, relator introduced nine exhibits that included reports, studies and surveys conducted in other counties regarding jury selection and service.[4] We include the state's description of the exhibits as illustrative of the purpose for which relator offered them.

"The state disagrees with [relator's] representation in his brief that the exhibits showed that 'task forces in Multnomah and Marion counties had studied the process and had concluded there was a state-wide problem with the accuracy of the cross-section of the venire.' Although some of those exhibits showed that certain categories of people were statistically underrepresented on jury venires, they did not show that there was any underrepresentation that rose to the level of a constitutional violation. Moreover, the only study that referred to any sort of state-wide issue was the Oregon Supreme Court Task Force report, which stated only that it 'believes' that the results of studies in other counties would be similar to those in Multnomah County. At most, the exhibits tend to show that the names from the master and source lists could be used to discover some of the information (the race, ethnic, and other cognizable characteristics of individual jurors; the reasons they proffered for excusal from jury service) that could be used to support a fair-cross-section challenge.

"Exhibit 102 is an excerpt of the 1994 report of the Oregon Supreme Court Task Force on Racial/Ethnic Issues in the Judicial System. The Task Force report is based on 'opinions based on actual experience,' and 'repeated testimony that jury pools in Oregon do not adequately represent the racial and ethnic diversity of courts' districts.' The Task Force stated that those perceptions are 'confirmed' by a study of the Multnomah County jury system, and that it 'believes that similar results would be obtained if the same study were conducted in other areas of the state.'

"Exhibit 103 is an excerpt from the 1993 Multnomah County study. The study was done by Portland State University students and was based on surveys of a scientific

---

[4] We express no opinion on the correctness of that procedure or other procedures that the parties used in this case.

sample of jurors and those subpoenaed but who did not serve. The study compared the representation in those two groups to 'the general population in the community as reflected by the 1990 census.'

"Exhibit 104 is an analysis of juror satisfaction done by the Office of the State Court Administrator in 1999. The study found a disparity between the percentage of Hispanic and Latino residents in the county and those who were summoned for jury service during a 1-year period in 1997 and 1998. However, the study noted, because a significant percentage of Hispanics (52.9% according to the United States Census Bureau in 1996) may not be citizens—and thus ineligible to serve as jurors—'it is expected that the percentage of Hispanic jurors summoned * * * will be substantially less than the percentage of Hispanics in Marion County.'

"The remaining exhibits consist primarily of correspondence to trial court administrators and by the State Court Administrator relating to composition of master lists. Exhibits 107 and 108 are reports published by the American Judicature Society regarding improving citizen response to jury summonses and enhancing the jury system. Finally, exhibit 109 is a transcript of testimony in another criminal case by [a witness] relating to studies that could be done based on master and source lists."

After the hearing, the trial court denied the motions and refused to consider release of the jury records, concluding that relator was required to "establish a material departure from the requirements of law as a preliminary step to obtain the information sought by his motions." Relator then filed a petition for an alternative writ of mandamus which this court issued.

This matter involves the interplay between ORS 136.005, a statute authorizing either party in a criminal case to challenge the lawfulness of the selection of a jury panel on statutory or constitutional grounds, and ORS 10.215, which establishes the confidentiality of certain jury records,[5] and

---

[5] ORS 10.215(1) provides, in part:

"Except as specifically provided by law, the State Court Administrator and circuit courts may not disclose source lists obtained from private or public entities, and jury lists containing names selected from a source list, to any other person or public entity."

ORS 10.275, which governs the release of those records in connection with a jury panel selection challenge.

■     To construe those statutes and the relationship between them, we use the methodology established in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). At the first level of analysis, we examine the text and context of each statute, giving words of common usage their plain, natural, and ordinary meaning. *Id.* at 610-11. If that examination reveals the clear intent of the legislature, then our inquiry is complete. *Id.* at 611.

We begin with ORS 136.005, which provides:

"(1)   The district attorney or the defendant in a criminal action may challenge the jury panel on the ground that there has been a material departure from the requirements of the law governing selection of jurors by filing a motion with the court supported by an affidavit alleging facts that, if true, constitute a material departure from the requirements of the law governing the selection of jurors. The party making the motion shall serve the motion and supporting affidavit on the other party, the trial court administrator and the State Court Administrator.

"(2)   A challenge to the panel shall be made before the voir dire examination of the jury.

"(3)   If the court determines that there has been a material departure from the requirements of the law governing selection of jurors, the court shall:

"(a)   Stay the proceedings pending the selection of a jury panel in conformity with the applicable provisions of law; and

"(b)   Grant such other relief as may be appropriate.

"(4)   The procedures prescribed by this section are the exclusive means by which a district attorney or defendant may challenge a jury panel."

Clearly, that statute authorizes a district attorney or a criminal defendant to challenge the jury panel by filing a motion "supported by an affidavit *alleging facts* that, if true, constitute a *material departure* from the requirements of the law governing the selection of jurors." (Emphases added.)

■     However, ORS 136.005 does not define the words "material" and "departure." Consistent with the *PGE* methodology, we give those words of common usage their plain, natural, and ordinary meaning. The word "material" has a number of meanings, which include: "being of real importance or great consequence: SUBSTANTIAL * * * : ESSENTIAL * * * : RELEVANT, PERTINENT." *Webster's Third Int'l Dictionary* 1392 (unabridged ed 1993). "Departure" is defined as "deviation or divergence esp. from a rule, course of action, plan, or purpose ‹a ~ from official procedure›." *Id.* at 604. Thus, as a textual matter, "material departure," under ORS 136.005(1), means that the affidavit must allege facts that, if true, constitute a "deviation" of "great consequence" from constitutional or statutory procedures that govern the selection of jurors.

■■     The state and relator assert, and we agree, that a legally cognizable challenge must be alleged under ORS 136.005(1) to trigger the provisions of ORS 10.275, which govern the release of confidential jury records. That prerequisite does not mean, however, that the party challenging the selection of the jury panel under ORS 136.005(1) must prove, or that the trial court must find, that the facts alleged in the affidavit are true to trigger the provisions of ORS 10.275(1). Instead, initially the trial court must determine only whether the facts alleged in the affidavit, if true, allege a "material departure" from statutory or constitutional requirements governing the selection of jurors.

We turn next to ORS 10.275(1), which provides:

"A person challenging a jury panel under ORS 136.005 or ORCP 57 A who seeks jury records that are confidential under ORS 10.215 must include a request for access to the confidential records in the motion challenging the jury panel. The motion and supporting affidavit must be served on the trial court administrator and the State Court Administrator. The request must:

"(a)   Specify the purpose for which the jury records are sought; and

"(b)   Identify with particularity the relevant jury records sought to be released including the type and time period of the records."

That statute requires that a party seeking access to confidential jury records in connection with a motion challenging the selection of the jury panel include a request for access to those records. The request must specify the purpose for which the records are sought and identify with particularity the relevant jury records sought to be released, including the type and time period of the records.

When a legally sufficient challenge has been alleged under ORS 136.005(1), ORS 10.275(2)[6] then authorizes the trial court to order release of jury records that the moving party may use to prove the merits of the asserted challenge. A trial court's decision to order release of the records must be premised on findings that the records are "likely to produce evidence relevant to the motion" and that the production of the "jury records is not unduly burdensome." ORS 10.275(2).[7] We now turn to the specific issues of this case.

■ In this case, the trial court did not apply the provisions of ORS 10.275 because it concluded that ORS

---

[6] ORS 10.275(2) provides:

"The court may order release of the jury records if the court finds that:

"(a) The jury records sought are likely to produce evidence relevant to the motion; and

"(b) Production of the jury records is not unduly burdensome."

[7] However, under ORS 10.275(3) a trial court that orders release of jury information may circumscribe the use of that information:

"An order under subsection (2) of this section may include, but need not be limited to:

"(a) A requirement that the moving party provide advance payment to the trial court administrator and, if applicable, the State Court Administrator for the reasonable costs of providing copies of the jury records; and

"(b) Restrictions on further disclosure of the jury records including, but not limited to:

"(A) A requirement that the moving party return all originals and copies to the court at the conclusion of the proceeding;

"(B) A requirement that the jury records may be used only for the purpose of supporting the jury panel challenge made in the motion;

"(C) A prohibition against distributing the jury records to a person who is not an agent or representative of the moving party; and

"(D) A prohibition against contacting or attempting to contact the persons whose names appear on the jury records without specific authorization of the court."

136.005(1) required relator to "establish a material departure from the requirements of the law as a preliminary step to obtain the information sought by his motions." However, ORS 136.005(1) requires only that relator *allege* facts that, *if* true, constitute a material departure from the requirements of law. The trial court impermissibly required relator to prove that his motion would succeed to trigger the statutory provisions governing release of the jury records that may support the motion.

The state argues that, even if the trial court used the wrong standard in deciding relator's motions, the trial court's error is of no consequence because the legal sufficiency of relator's allegations is a question of law, which this court now may decide under the correct statutory standards. In other words, the state contends that relator's motions, affidavit, and exhibits do not, as a matter of law, allege facts that, if true, constitute a material departure from statutory or constitutional requirements.

■    In support of that argument, the state asserts that, at most, "the affidavit and motion[s] allege as fact that Hispanics are 'underrepresented,' and that the procedures [summoning and excusal of jurors] permit excusal of potential jurors who are 'not entitled' to excusal from jury service." The state argues that, as a matter of law, those facts, if true, would not constitute a violation of relator's rights under the constitutional provisions on which he relies.

According to the state, the elements of a *prima facie* case, with regard to the Sixth Amendment fair cross-section requirement, require a criminal defendant to show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process. *See Duren v. Missouri*, 439 US 357, 358, 99 S Ct 664, 58 L Ed 2d 579 (1979) (identifying factors necessary to prove Sixth Amendment fair cross-section violation).[8] It is the state's

---

[8] Although we discuss only relator's Sixth Amendment jury challenge, we note that relator also asserts a Fourteenth Amendment equal protection challenge to

position that, even assuming that people of Hispanic origin are a cognizable group[9] within the meaning of the fair cross-section requirement, relator's assertion in his motion that Hispanics are "underrepresented" does not identify at what stage of the jury selection process that group is underrepresented and thus does not demonstrate that they are "systematically" excluded from being part of the pool of available jurors.[10] Therefore, according to the state, relator's assertion that people of Hispanic origin are "underrepresented" in the jury panel does not allege any material departure from the Sixth Amendment fair cross-section requirement.

Relator does not contest the state's characterization of the elements necessary to demonstrate a violation of the Sixth Amendment fair cross-section requirement. Instead, relator simply asserts that the motions and affidavit, as supplemented by the findings, conclusions, and assertions contained in the various exhibits, are sufficient to allege a Sixth Amendment jury selection challenge under ORS 136.005(1). We agree with relator.

---

the selection of the jury panel. In *Castaneda v. Partida*, 430 US 482, 494, 97 S Ct 1272, 51 L Ed 2d 498 (1977), the Supreme Court summarized the requirements for proving an equal protection violation:

> "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. * * * Finally, * * * a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing."

(Citations omitted.)

Under a Fourteenth Amendment equal protection challenge the exclusion of a cognizable group must be "purposeful." However, the moving party may prove that requirement by circumstantial evidence establishing a "clear pattern, unexplainable on grounds other than race, [that] emerges from the effect of the state's action even when the governing legislation appears neutral on its face." 430 US at 493 (quoting *Arlington Heights v. Metropolitan Housing Corp.*, 429 US 252, 264-65, 97 S Ct 555, 50 L Ed 2d 450 (1977)).

[9] The state points out that the term "Hispanic," for purposes of the jury challenge that relator has framed, is not easily defined. However, the state has not challenged, at this stage of the proceedings, relator's assertion that Hispanics are a cognizable group for purposes of a jury selection challenge based on the Sixth and Fourteenth Amendments.

[10] The state appears to concede that "systematic exclusion" under the Sixth Amendment does not mean "intentional exclusion," but, instead, means exclusion that results from something inherent in the particular jury-selection process utilized.

The motions and affidavit filed in this case are of the "bare bones" variety. They assert as fact that "Hispanics are underrepresented in the jury panel."[11] And, as noted, the record contains a number of exhibits that include studies and reports supporting relator's assertion that, on a statewide basis, distinctive groups, including Hispanics, are underrepresented in Oregon jury pools.

The question at this stage of the proceedings is whether those assertions are sufficient under ORS 136.005(1) to require the trial court to consider release of the jury records under the requirements specified in ORS 10.275(1). We conclude that relator's assertion that "Hispanics are underrepresented" in the jury panel, as supplemented by the other exhibits introduced at the hearing, are sufficient, though barely so, to allege a "material departure" from the requirements of law governing selection of jurors.

Because relator has alleged sufficiently a jury selection challenge under ORS 136.005(1), we direct the trial court to vacate its order denying the renewed "motion challenging jury panel & to produce source lists" and "motion to produce jury lists."[12] The trial court must consider release of the jury records that relator seeks, in accordance with the requirements of ORS 10.275.[13]

Peremptory writ to issue.

---

[11] It appears that relator intended to incorporate the assertions in the motions regarding underrepresentation of Hispanics into the assertions made in the affidavit. We treat the motions and affidavits in that manner for purposes of this opinion.

[12] Having concluded that the trial court's order is infirm on statutory grounds, we need not reach relator's argument that he is entitled to the records as a matter of constitutional right. *See Crocker and Crocker*, 332 Or 42, 46, 22 P3d 759 (2001) (court ordinarily will not decide constitutional questions when adequate subconstitutional basis for decision exists).

[13] We decline to order the release of the jury information at this stage of the proceedings because the provisions of ORS 10.275(2) and (3) contemplate that a trial court will exercise discretion in devising and overseeing the release and use of the jury records.